## OTIS ELEVATOR CO. v. PACIFIC FINANCE CORPORATION et al.

### No. M–25.

District Court, S. D. California, Central Division.

Oct. 2, 1931.

Wallace R. Lane, Edwin W. Sims, and Clarence J. Loftus, all of Chicago, Ill., and Raymond Ives Blakeslee, of Los Angeles, Cal., for plaintiff.

Lyon & Lyon, of Los Angeles, Cal., for defendants.

JAMES, District Judge.

Plaintiff sued for an injunction and damages, charging infringment of claims 3, 22, 29, 37, 40, 41, and 65 of letters patent No. 16297, which is entitled "Control for electric elevators."

The cause was referred to a special master, the defendants not consenting, and thereafter, on February 25, 1930, the master filed his report with the court, finding that the defendants had infringed claims 3, 22, 29, 40, and 65. He found that claim 37 was invalid, and that claim 41 was valid, but not infringed. Specifications of exceptions were duly filed on the part of the defendants to the report of the master, and an oral argument was had thereon on October 15, 1930, which argument was in addition to extensive briefs theretofore filed.

On May 1, 1931, the plaintiff filed disclaimer in the United States Patent Office as to claim 37 which the master has determined was invalid. Pending a decision of the cause, defendants moved the court to dismiss the case on the ground that the plaintiff had unduly delayed the filing of its disclaim-

er as to claim 37, citing Ensten et al. v. Simon, Ascher & Co., 282 U. S. 445, 51 S. Ct. 207, 75 L. Ed. 453. The argument on the motion to dismiss presented the contention that, the plaintiff having failed to except to the finding of invalidity made by the master as to claim 37, and having allowed the time intervening from February 25, 1930, the date of the filing of the master's report, and May 1, 1931, to elapse without disclaiming, the case came within the effect of the decision above cited. That motion was submitted, and is now to be first disposed of. It would seem that, where no final decree is made adjudging any claim of a patent to be invalid, the patentee is not required to disclaim. It is true that no exception was taken to the report of the master finding claim 37 invalid, but the entire report was, at the time of the making of the motion, still before the court subject to being passed upon, changed, or modified. There was no decree interlocutory asked for to confirm the report as to the finding of invalidity for lack of exception taken; hence, in my view, the matter remained at large, and the commencement of the reasonable time within which the plaintiff might disclaim would be the entry of such decree. I am, therefore, of the opinion that the motion to dismiss should be denied, and it is so ordered.

▮ We now pass to the consideration of the main case on the report of the master. The finding is that the defendants have infringed plaintiff's patent right. Plaintiff elevator company is the assignee of the inventor, Humphrey F. Parker. The latter filed his first application for patent on April 25, 1921, and patent issued thereon August 26, 1924. Parker offered his invention for sale to the plaintiff in 1922, which offer was at first not taken up, but at a later time (1925) the plaintiff bought the patent, paying a small sum of money for it. Reissue was made at the instance of plaintiff. The defendant Llewellyn Iron Works installed for the Pacific Finance Corporation in an office building in Los Angeles City elevator equipment consisting of a bank of four cars, designed to be operated at high speed for passenger service.

The master's report shows that he gave close study to the evidence presented to him, and that he acquired a very thorough knowledge of the mechanics—electrical and other kind—involved in the Pacific Finance installation, as well as those included within the specifications and claims of plaintiff's patent. The patent law which he applied to the facts as found by him seems to accord with well-established principles.

An understanding of the design and working of the Parker invention can be quite readily understood, because it is comparatively simple. An understanding of the complicated apparatus used in the defendants' installation requires concentrated effort of many hours' duration and involves the examination of a multitude of schedules and drawings. It is impossible to follow in detail a description of defendants' elevator system without resort to the drawings and schedules; hence a closely particularized description cannot be set forth in any opinion unless the formal data referred to is made a part of it.

The witness DeCamp, an expert engineer employed by the defendant Llewellyn Iron Works, furnished the testimony from which the master made his conclusions with respect to the form and mode of operation of the alleged infringing installation.

In the patent sued upon, Parker, the inventor, stated, as descriptive of his inventive idea, the following:

"This invention relates, generally, to a system and means for controlling electric elevators; and the invention has reference, more particularly, to a novel system and means of control whereby the elevator car may be caused to automatically stop in proper alignment with predetermined floor levels by virtue of the actuation or setting of secondary control means, which may be provided within the car alone, or both within the car and at each floor level; said secondary control means being adapted to cooperate with the master control switch within the car, which master switch is subject to the manual control of the car operator. Furthermore, this invention relates to a system and means for controlling electric elevator cars, whereby the starting of the car, either up or down in the shaft, is entirely and singly within the manual control of the car operator, but whereby the stopping of the car at predetermined points in its ascent or descent may be automatically attained if desired.

"The invention has for its principal object to provide a novel system and means for controlling electric elevators of the general characters above mentioned, which is adapted to eliminate the errors made by inexpert operators, who bring the car to a stop a few inches above or below the proper level, and to also prevent such operators failing to stop at a floor which a passenger has previously called for."

In the drawings he illustrated the means and combination of means used as being a manually operated switch in the elevator car with push buttons in the car and at each floor landing, one for up and one for down, a floor selector operating in conjunction with the power means; means for establishing circuits to operate the motor switch and reverse the same; means through electrical circuits whereby, by operation of the push buttons, the power of the hoisting motor would be applied and shut off, and circuit means whereby the push buttons, after the car reached the predetermined floor, would be reset. The master's report may be referred to for a more complete description of the Parker device. Distinguishing characteristics of that device are: When the manual control lever in the elevator car is moved to an up position, it moves a contacting plate across separated terminals, which complete the circuit to operate a switch on the driving motor and the car moves upward. The control lever may then be swung to a neutral position without opening the power switch. This is accomplished by the use of a magnet, which becomes active when the up contact is made, and which holds the contacting plate in position of contact against a spring which, except for the exertion of the holding power of the magnet, would return the contacting plate to the "off" position, to follow the return of the control lever to neutral. The selector means consists of a disc, to which wires leading from the buttons and button relays are connected. The disc revolves synchronously with the movement of the elevator so that the lever of the selector will make contact with the floor or elevator button leads when the car arrives at the indicated floor, and through that means the circuit to the switch holding magnet will be broken. When that current is broken, the spring on the car lever will return the contact plates to the off position. Simultaneously, the push button will be reset by the energizing of a magnet coil winding on each button attachment. There is a tail piece to the control lever, which makes certain contacts, the effect of which is not necessary to be discussed, although the contention is made by the defendants that, in the operation of the lever, the latter contact will cause the combination to be inoperative because it will function to release the holding switch. I think that we may disregard the latter contention and assume that this tail piece function is not a material part of the invention mainly disclosed, because the manual switch may be used without it.

In order to determine just what it was that Parker conceived which involved invention and novelty, the development of the art in elevator control by electrical means as it existed at the time he obtained his patent must be carefully examined. If no such means of electrical control had theretofore existed and Parker had, for the first time, devised a system which supplied a new and highly desirable form long looked for by the manufacturers of elevators, the claim of a primary and pioneer invention might well be predicated. In the course of his findings, the master stated: "Coming from one not trained in the art, it has taught the art a new means of control that solves many old problems. That it was contributed by an outsider negatives any theory that it was an obvious step. Otherwise, elevator engineers would have accomplished it long before Parker. * * * The invention, judged by the results, is a radical step forward. Parker is entitled to a high standing for the inventive thought expressed in his patent." Thus the master has characterized the Parker invention as being entitled to the tribute of great inventive advance over the prior art. Given that character, he necessarily assumes that a wide range of equivalents must be accorded to it. This conclusion has fundamental relation to the finding of infringment as made by the master.

On the record presented, to which I have given careful and painstaking study, I am totally unable to agree with the master; my conclusion, to the contrary, is that, when Parker conceived his invention, the art of elevator control by electrical means, if not already crowded, was certainly well occupied. Considering his elements separately, there was nothing at the time new in the use of push buttons at the floors or in the car which would operate through electrical magnets to connect and disconnect the current feeding the hoisting motor; there was nothing new in a selector means moving synchronously with the elevator car to make and break auxiliary circuits; there was nothing new in a circuit arrangement by which push buttons would be reset after being operated through coil wound magnets. At the time Parker conceived his invention, the type of electrically controlled elevators, such as is common in apartment houses and some business buildings, whereby, by means of push buttons at floor landings and in the car, the elevator can be started and will be stopped automatically, was in common use.

On October 7, 1902, a patent was issued to J. D. Ihlder (No. 710,914). Ihlder's sys-

tem included a single push button at each floor and push buttons in the car by which the car would be started and would automatically stop at the indicated floor. He further provided that the system should be "non-interfering," in that, after a button indicating a particular floor was once pushed, the pushing of another button on another floor would not stop the car before it reached the first indicated stopping point. One of the features of the Parker system is that the car will be stopped at the different floors in succession where several buttons have been simultaneously or successively set. Ihlder had the particular purpose of making his non-interfering, but, as defendants' counsel argues, the mechanism of Ihlder's system might easily be adjusted, using ordinary engineering skill, so as to be either "interfering" or "non-interfering."

It would only serve to prolong this opinion to unnecessary length were I to discuss and analyze the several prior art patents which were introduced in evidence, all referring to systems for the starting and stopping of elevator cars by electrical means, including the use of push buttons at the floors and in the car. All of these are illustrated in the exhibits and in the printed brief filed by the defendants. As to the form and mode of operation of the devices represented, there is no dispute. They are all cumulative evidence to the point that, at the time Parker conceived his invention, the art in which he was working was highly developed. Hence, it must be determined that this patentee, in so far as his system exhibits invention, is limited closely to the form and structure described, and that the range of equivalents allowed to him is restricted narrowly to those which substantially embody the things that he describes and specifies.

The important function that the Parker system is designed to perform is to stop an elevator car automatically at a floor landing. The patent shows no means of so producing the stop, except that a switch operates to disconnect the current from the driving motor. Parker adds that the timing of the circuit-closing means shall be so arranged as to allow for "the timely operation of the usual braking mechanism to overcome the momentum of the car so that the ultimate point at which the car comes to rest will be in proper alignment with the floor level." Braking means known and in use at the date of the patent, as I understand the evidence to show, included only a brake which might be operated electrically through a magnet, or by other power, and which would make contact with some of the revolving parts of the motor, or an attachment made therewith, so as to hold the motor in a locked position. No braking means were then in use which were adaptable to fast-moving elevator cars and by means of which the car could be accurately leveled with a floor. It can be well understood that variation in the load carried by the car, unless the same was moving at a comparatively slow rate of speed, would make ordinary braking means then known unsuccessful in bringing the car to a floor level with any degree of accuracy. And here it may be stated that neither the control system of Parker nor any of those included in inventions theretofore made were adaptable to the operation of fast-moving elevators such as are necessary to be used in buildings containing many stories like the modern skyscraper. It was admitted at the hearing before the master by plaintiff's counsel that further invention was required beyond that of Parker to make his system adaptable at all for fast-moving elevators. Before referring particularly to the exceedingly complicated mechanism of the defendants' elevators, which are claimed to embody infringment of the Parker patent, it may be stated that I am unable to conclude that the Parker system could by any reasonable modification be transplanted into the elevator control system of the defendants; any attempt so to do would result in the essential means described by Parker being utterly changed, obliterated, and lost so that no substantial identity could be ascribed to the resulting combination. Parker never constructed or had constructed an installation demonstrating his system; neither does it appear that the plaintiff here, who purchased his patent, has ever used it in the form taught and specified in the patent. The plaintiff, subsequent to the date of the Parker patent, secured patents issued to it covering control systems for fast-moving elevators. I do not understand that it is claimed that plaintiff made use of the Parker disclosure as specified at all, but that it adopted "equivalents" of the essential parts.

In its operation the main function of the Parker invention is to cut off the power from the hoisting motor when the elevator car reaches the predetermined floor. In the first place, the defendants' system of control does not stop the car by cutting off the power from the motor. At the time MS cam runs out from the roller on the leveling drum, the car has been practically stopped through the operation of the various relays affecting the current of the generator field. Direction contactor 27 is not opened until the car is about

¾″ from the floor. It is at this time contactor 27 is opened and brake releasing contactor 29 drops out and the brake is applied. Main line contactor 48, as I understand it, operated by contactor 15 on brake release 29, does not open to affect contactor 48 until after the car has come to a complete stop. Witness DeCamp, in that connection, testified: "The generator armature is connected directly to the armature of the elevator hoisting motor by means of a main line contactor, which is closed while the elevator is in motion, and is kept closed for two or three seconds after the elevator has come to a complete stop. In other words, the main connections between the Ward Leonard generator and the main elevator hoisting motors are never disconnected until it is absolutely sure that the elevator has come to a complete stop, and only then for two or three seconds afterwards." I have let it be understood that the master's report properly describes the operation of defendants' system. Counsel for defendants has found some fault with the conclusion of the master where he says: "In operation, the completion of the circuit through the car switches and 2U or 2D switches breaks the holding circuit to initiate the stopping of the car. It has been previously pointed out that these stopping circuits and circuit closing means are equivalent to the means disclosed by Parker."

The specific complaint is that the master's statement indicates a conclusion that the 2U or 2D switches break the holding circuit. The 2U and 2D switches operate intermediately only. For instance, referring to the use of 2U, which operates during the up movement of the elevator car: On the primary leveling drum carrying the 2U switch, the cam is short and only makes momentary contact, and then drops out and remains out. This contact causes relay No. 4 to energize relay No. 1. Relay No. 1 sets up a self-holding circuit, which maintains No. 1 during the slow-down period until the car latch is raised. Relay No. 1 carries three normally open contacts, and one normally closed contact. One of the open contacts maintains No. 1 closed until the latch is raised. The second contact of No. 1 energizes coil 31, which is slow-down contactor through resistor. The third contact on No. 1 energizes one side of coils 6, 7, 8, all of which, among others, insert resistance in the generator field in conjunction with the secondary slow-down drum to reduce speed in diminishing steps. Without following through by number the contacts intervening or describing specifically the detailed operation of the 3–E switches on secondary slow down drum, the point is reached where the back contact of No. 11 relay closes and circuit is set up to transfer the direction contactors to leveling drum No. 4 carrying the MS switches. After this time, direction contactor is entirely under the control of the cams on leveling drum No. 4. The car is then traveling at only the rate of about 25 feet per minute. When the car reaches within a fraction of an inch of the floor, the 4 MS switch is released by the cam running out from the switch roller, direction contactor 27 is opened to kill the generator field, the brake is released through contactor 29, the car stops level with the floor, contactor 15 on brake release 29 thereafter opens 31 and main line 48 and motor full field 19 is de-energized. As before mentioned, the last operation occurs after the car has come to a complete stop.

There is no similarity between the control lever of the defendants' system and the Parker specially designed starting lever with its circuit closing plates held by an electro magnet. There is no identity, substantial or of other kind, between the Parker coil 32 and relay 46, the 2U or 2D switches, or other innumerable circuit holding relays and contactors used in defendants' high speed elevator control system. Admittedly, there is nothing in Parker's disclosure which can make his installation work where more than one elevator is being operated. Wonderful ingenuity is displayed in the highly complicated slow-down and floor selector machines used by the defendants. As before stated, the only way that the system used by the defendants can be pictured is to illustrate it with the drawings and photographs introduced in evidence and to follow through, step by step, using drawings reference figures, the entire course of operation from the time the operator turns his switch establishing contact admitting the current which actuates the several relays first placed in circuit to start the car on its journey. I have arrived at an understanding of the complicated picture by close and arduous study, more study in fact than I have found necessary to devote to any patent case presented during my experience on the bench. It will not be useful now or helpful to an Appellate Court for me to attempt here to analyze the system at length. Any judge who essays to make the necessary comparison between the Parker system and the one as to which the charge of infringement is based will have before him the same task that I had. I have intended this to serve only

as a statement of my conclusions. The illustrations used are necessarily imperfect for the reasons given.

I think the master's finding that claims 3, 22, 29, 40, and 41 are valid may be sustained as for the particular forms described in the Parker patent. The exceptions to the master's conclusions that the defendants have infringed are sustained. Findings and decree will be entered in favor of the defendants on the issue of infringment, with costs. An exception is noted in favor of the defendants to the court's order denying the motion to dismiss for lack of disclaimer filed, and the usual exception will be noted in favor of the plaintiff to the findings and decree when entered.